[Civ. No. 23423. Second Dist., Div. Three. Aug. 6, 1959.]

LAWRENCE COX, a Minor, etc., et al., Respondents, v. PRUDENTIAL INSURANCE COMPANY OF AMERICA (a Corporation), Appellant.

Adams, Duque & Hazeltine, Maurice C. Inman, Jr., and James S. Cline for Appellant.

Mizener & Arguelles for Respondents.

WOOD (Parker), J.—Action to recover accidental death benefits under two life insurance policies. In a nonjury trial, judgment was for plaintiffs. Defendant appeals from the judgment.

Appellant contends that the evidence does not support the finding to the effect that the death of the insured was caused by accidental means.

On July 19, 1955, defendant issued a life insurance policy

in the amount of $5,000 on the life of Vernon Cox. The wife of the insured was the beneficiary under that policy. On February 6, 1956, defendant issued its additional agreement for an accidental means death benefit in the amount of $5,000, which agreement was attached to the policy.

On December 28, 1955, defendant issued another life insurance policy in the amount of $5,000 on the life of Vernon Cox, and the policy included a provision for an accidental means death benefit in the amount of $5,000. The wife and the two children of the insured were beneficiaries under that policy.

The provision in each of those policies, with respect to accidental means death benefits, was in part that the insurance company would pay, in addition to the benefits otherwise payable under the policy, the amount of the accidental means death benefit upon proof that the death of the insured occurred as a result, directly and independently of all other causes of bodily injuries effected solely through external, violent, and accidental means.

On March 3, 1956, while the insured was attempting to escape from the custody of police officers who were transporting him in an automobile, he was run over by a truck and was killed. The insurance policies were in effect at that time. The insurance company paid the face amounts of the policies to the named beneficiaries (that is, $5,000 on each policy), but it refused to pay the additional benefits that would be payable in the event of death by accidental means. The named beneficiaries sought, by this action, to recover said additional benefits (that is, an additional $5,000 on each policy).

The court found that the death of Cox occurred "as a result, directly and independently of all other causes, of bodily injuries effected solely through external, violent and accidental means."

Appellant argues that the evidence shows conclusively that the death of Cox occurred as the result of the natural, probable, and foreseeable consequences of his voluntary act which he knew or reasonably should have known would result in his death or bodily injury.

On the date of his death, Cox was 31 years of age, 5 feet 9 inches tall, and weighed between 150 and 160 pounds. He was slender and agile. He had been convicted of forgery twice, and he was on parole on said date.

On March 3, 1956, about 7 a. m., Officers Laughlin and Makshanoff of the Los Angeles Police Department, who had

a warrant for the arrest of Cox on a charge of two counts of forgery, took him into their custody at the city jail in Oakland. They handcuffed him and proceeded to take him, by automobile, to Los Angeles. When they stopped in Tracy for breakfast, the officers removed the handcuffs from Cox. Thereafter the handcuffs were not replaced on him.

During the trip, Cox sat on the right side of the rear seat of the automobile. The officers alternated in driving. One officer sat on the left side of the rear seat. While they were traveling, the rear doors were locked. They stopped at Bakersfield for lunch. About 3 p. m. they stopped at Pacoima, where Officer Laughlin, who had been driving, got into the rear seat, and Officer Makshanoff became the driver. The attempted escape (hereinafter referred to in detail) occurred on San Fernando Road about a mile south of Pacoima.

The automobile was a 1955 four-door Chevrolet sedan. Each rear door of the automobile was hinged at the part of the door which was toward the front of the automobile—that is, the door opened by swinging toward the front of the automobile. Each door could be opened (from inside the automobile) by means of a handle which was near the rear part of the door. A door could be locked (from inside) by pressing a button which was near the front part of the door. In order to unlock a door (from inside) it was necessary to raise the button.

San Fernando Road, at and near the scene of the attempted escape, was about 50 feet wide, and it extended northerly and southerly. A double white line was approximately in the center of the paved portion of the highway. Immediately west of the double white line there was a marked traffic lane about 9 feet wide. Immediately west of the single white line (which marked that lane) the paved portion of the highway was about 14 feet wide. In other words, the paved portion of the highway on the west side of the double white line (for southbound traffic) was divided, by a single white line, into two traffic lanes—the inner lane was about 9 feet wide, and the outer lane was about 14 feet wide.

Officer Laughlin testified that "in the open places" between Fresno and San Fernando Road, they traveled 55 to 60 miles an hour; after they were on San Fernando Road traffic became heavier and they traveled 30 to 35 miles an hour; about 3:15 p. m., when they were on San Fernando Road about a mile south of Pacoima, the attempted escape occurred, and at that time the automobile was traveling south between

25 and 30 miles an hour; the automobile was on the west side of the highway in the lane next to the double white line and was gradually passing a 60-foot-long "truck-away" (a truck for hauling automobiles), which truck was traveling in the outer or west lane; the truck was about 4 feet to the right of the police automobile, and it was empty and making "a lot of noise"; Cox had a cigarette in his mouth and he asked the officer for a match; the officer lighted the cigarette and gave him a package of matches; Cox took a puff from the cigarette and then dropped the cigarette; then Cox, using his left hand, pulled up the lock button of the right rear door, and at the same time, using his right hand, he hit the door handle of the rear door; he threw the door open and started out the door; the officer grabbed the back of Cox' shirt; Cox twisted around until he faced the officer; he pulled away from the officer's grasp and stepped backward out of the door; his feet hit the pavement, and he was facing the direction in which the automobile was traveling; he immediately fell on his back and "bounced a little"; at that time Cox was at the side of the truck and about 45 feet from the front and about 15 feet from the back of the truck; Cox lay lengthwise of the highway for "two or three seconds" and then he raised the upper part of his body and turned his head toward traffic from the north; when the rear wheels of the truck were "within two or three feet" of Cox, he "just sort of threw himself or rolled" to the right and under the left rear wheel of the truck; the wheel ran over his head and killed him; at that time, a garbage truck was behind the automobile-transport truck; also at that time, an automobile was behind the police automobile. The officer testified further that Cox "had a good breakfast" and had a sandwich for lunch; during the trip Cox talked with them and was quite cooperative.

Officer Makshanoff testified that the first he knew of the occurrence was when Officer Laughlin called him; he turned and saw Cox lying on the street; the rear dual wheels of the truck were then about two feet from him; Cox was "looking to the right and behind him"; when Officer Laughlin called him, the police automobile was traveling "close to 30 miles an hour, give or take a couple of miles." The officer testified further that during the trip Cox talked with him and discussed his (Cox') problems; at lunch "there didn't seem to be anything mentally wrong with him"; Cox was a cooperative prisoner.

The driver of the automobile-transport truck testified that

he did not see Cox prior to the accident; there were four Ford trucks on the transport truck; the truck was traveling in the outside traffic lane when he "felt a bump and glanced in the rear view mirror and saw it"; at the time he felt the bump, the truck was traveling 25 to 27 miles an hour and was 8 to 12 inches to the right of the single white line which marked the left side of the lane in which the truck was traveling; at the time of the accident there was "the usual heavy traffic for Saturday afternoon"; after the accident, Cox' body was lying from 8 to 12 inches to the right (west) of the single white line.

Mrs. Cox testified that Cox called her by telephone on Friday (the day before his death) and said that he would be returning to Los Angeles on Saturday, and he asked her to keep in touch with him; he also said that he would contact her later, that he would keep in touch with the children, that he had other plans for them, and he would like to take them in the summer to see his mother.

Appellant contends that the evidence does not support the finding to the effect that the death was caused by accidental means. It argues that Cox voluntarily and intentionally performed each act constituting the means which caused his death, and therefore the "means" were not accidental means. It argues further that the evidence shows that death or bodily injury was the reasonably foreseeable and probable result of the voluntary acts of Cox, and therefore his death was not caused by accidental means.

■ In *Olinsky* v. *Railway Mail Assn.*, 182 Cal. 669 [189 P. 835, 14 A.L.R. 784], it was said (pp. 672-673): "The distinction between accidental death and death by accidental means is carefully pointed out in . . . [citation of a Texas case]. The uniform rule on the subject is thus well stated in that case: 'Where the death is the result of some act, but was not designed and not anticipated by the deceased, though it be in consequence of some act voluntarily done by him, it is accidental death. Where death is caused by some act of the deceased not designed by him, or not intentionally done by him, it is death by accidental means. In other words, accidental death is an unintended and undesigned result, arising from acts done; death by accidental means is where the result arises from acts unintentionally done.' "

■ In *Rock* v. *Travelers' Insurance Co.*, 172 Cal. 462 [156 P. 1029, L.R.A. 1916 E 1196], it was said at page 465: "The policy, it will be observed, does not insure against accidental

death or injuries, but against injuries effected by accidental means. A differentiation is made, therefore, between the result to the insured and the means which is the operative cause in producing this result. It is not enough that death or injury should be unexpected or unforeseen, but there must be some element of unexpectedness in the preceding act or occurrence which leads to the injury or death."

In *Rooney* v. *Mutual Benefit H. & A. Assn.*, 74 Cal. App.2d 885 [170 P.2d 72], it was said, at page 890: "The rule in California is that each case must stand upon its own facts and that the legal principles enunciated as to what constitutes 'accidental means' as distinguished from 'accidental result' must be applied to such facts as appear in the particular case. . . . To prevent a recovery upon such a policy [accidental means policy], it must be made to appear that in utilizing the means to which he resorted the insured knew or should have known that he would probably sustain the injury which resulted as a consequence thereof."

In *Losleben* v. *California State L. Ins. Co.*, 133 Cal.App. 550 [24 P.2d 825], the insured jumped from the top of a work bench to the floor, a distance of 3 feet. In that case a physician testified that the cause of death was peritonitis which was caused by the twisting of the small intestine during the jump. ■ It was said therein, at page 556: "While an injury to an insured person may result in greater or less degree from an original voluntary act upon his part, if there is some evidence which justifies the inference that the means which produced the injury contained something of an unexpected or unforeseen character involving other acts not intentionally done, the resulting injury may be said to be caused through accidental means." It was also said therein, at page 557: "It cannot be said, as a matter of law, that the result flowed from any voluntary act done and that the only means through which the injury occurred were those which the insured intended to employ. In our opinion, a question of fact was presented which was for the jury."

■ In the present case it is undisputed that Cox intentionally got out of the moving automobile, and that he was intending to escape from the custody of the officers. The answer alleged that the death occurred in the course of an attempt to escape. The trial judge found, as above stated, that the death occurred through accidental means. Since it is clear that Cox voluntarily got out of the automobile, it is implicit in that finding that his landing on his feet, his falling

backward, and his lying lengthwise of the highway for two or three seconds were not caused by accidental means. Up to that point in the attempted escape, there was no evidence that he was fatally injured. The fall on the highway did not kill him. There was evidence that after he had lain lengthwise of the highway for two or three seconds he raised the upper part of his body and turned his head toward approaching traffic. At that point in the attempted escape, he was not in the traffic lane where the transport truck was traveling. If he had remained at that place on the highway the truck would not have run over him. He was killed after he threw himself or rolled to the right under the truck. It thus appears that the circumstances, immediately before and while Cox was throwing himself or rolling to the right, presented a question of fact as to whether he was intending to place his head in front of the truck wheel, or whether he was attempting to avoid being struck by the wheel. The presumption is against suicide. As above stated, before going to the right he raised the upper part of his body and turned his head toward approaching traffic. The trial judge could infer that Cox did not anticipate that, as a result of going to the right, he would be run over by the truck. The judge could have inferred that Cox went to his right in an attempt to avoid the truck and that, in making such attempt, he misjudged the location or speed of the truck. It cannot be said as a matter of law that Cox knew or reasonably could have anticipated that in going to his right he would be run over by the truck. As stated in the Losleben case, *supra* (133 Cal. App. 550, 557 [24 P.2d 825]), it cannot be said, as a matter of law, "that the only means through which the injury occurred were those which the insured intended to employ." A question of fact was presented which was for the determination of the trial judge.

Appellant cites the case of *Sizemore* v. *National Casualty Co.* (1930), 108 W.Va. 550 [151 S.E. 841], and asserts that it involves a factual situation similar to the present case. In that case the insured, who was an officer, was transporting a prisoner in an automobile. While the automobile was traveling between 25 and 30 miles an hour, the prisoner escaped. The officer, in attempting to capture the prisoner, "stepped" from the moving automobile, fell on the pavement, and died as a result of a skull fracture. The policy in that case provided for indemnity for death resulting from accidental means, and also provided that the insurance company's

liability, in certain travel accidents, was limited to $2,000 if the insured should lose his life by being accidentally thrown from an automobile. It was said therein that the voluntary act of the officer in stepping from the automobile "robs it of its accidental nature," and that there was no evidence that the officer was " 'accidentally thrown from the car' within the meaning of the policy." In the present case it does not appear that the policies limited the liability of the insurance company with respect to travel accidents.

Appellant also cites *Zuliskey* v. *Prudential Ins. Co. of America*, 159 Pa.Super. 363 [48 A.2d 141], and asserts that the decision therein factually and legally controls the present case. In that case the insured died as a result of a skull fracture sustained when she jumped from an automobile which was traveling about 25 miles an hour. The policy therein provided for indemnity for death by accidental means. The court said that the death was not caused by accidental means. It was also said therein that: " 'If, in the act which precedes the injury, something unforeseen, unexpected, unusual, occurs which produces the injury, [it] has resulted through accidental means'. . . [citation]."

It is to be noted that in the Sizemore and Zuliskey cases, just cited, the insured persons sustained the fatal injuries as a direct result of falling on the pavement, and there was no injury by reason of an intervening agency such as injury caused by other traffic. In the present case, as above stated, Cox was not killed by falling on the pavement, but he was killed after he had raised the upper part of his body and thrown himself or rolled to the right.

Those cases (Sizemore and Zuliskey), which appellant states "factually and legally control" the present case, are cases in other jurisdictions (West Virginia and Pennsylvania) and were decided in 1930 and 1946, respectively. A discussion of decisions in various jurisdictions is in a comment note in 166 American Law Reports, Annotated, 469 (published in 1947). In that note it was said, at page 476: "In 1934, Mr. Justice Cardozo prophesied and used the following language [in a dissenting opinion) in objecting to any distinction between the term 'accidental means' and the terms 'accident' or 'accidental result': 'The attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian Bog. . . . When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental

means. . . . If there was no accident in the means, there was none in the result, for the two were inseparable. . . . There was an accident throughout, or there was no accident at all.' "

It was also said in said note, at page 477: "Mr. Justice Cardozo's prophecy, as above, is now close to fulfilment. This whole branch of insurance law has become shrouded in a semantic and polemical maze, and the result has been 'almost a wilderness of cases in which varying facts and situations have been applied to varying principles.' The situation is fast approaching a point where the slight flame of legal theory involved is being smothered. . . . Accordingly, the courts of last resort in several jurisdictions have accepted and approved Mr. Justice Cardozo's views as expressed above as a common-sense approach to the legal theory involved."[1]

Appellant cites several other cases in support of its contention that the death was not caused by accidental means. Those cases are factually distinguishable from the present case. It may be stated generally that in those cases the death was the direct result of the voluntary act of the insured (such as jumping from a high building or the top of a moving train) and no act of an intervening agency was involved; or that the death resulted from performing a daredevil stunt (such as handling a rattlesnake, playing Russian Roulette, or permitting a person to shoot at a can on the insured's head); or that the death resulted from fighting with guns.

The evidence was sufficient to support the findings in the present case.

The judgment is affirmed.

Vallée, J., concurred.

Shinn, P. J., dissented.

A petition for a rehearing was denied September 3, 1959. Shinn, P. J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied September 30, 1959. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.

---

[1]Arkansas, Colorado, Idaho, Iowa, Kansas, Nebraska, New York, Oklahoma, South Carolina, Utah, Vermont, Virginia, Washington, Wisconsin.